UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

**CHRISTOPHER WHITE and WILLIAM SUITOR**, individually and on behalf of all others similarly situated

                *Plaintiffs*,

     *vs.*

**Fein, Such & Crane, LLP,**

                *Defendant.*

**AFFIDAVIT**

Civil Action No.
15-cv-00438

---

STATE OF NEW YORK)
COUNTY OF MONROE) ss.

David P. Case, Esq. being duly sworn, deposes and says:

1) I am a partner of Fein, Such and Crane, L.L.P (hereinafter "the Firm"). I have been with the Firm since 2002. My career has been spent representing the financial services industry focusing on New York Foreclosures, post-foreclosure evictions, and contested litigation. I have lectured in many seminars directed towards attorneys for continuing legal education for the Monroe County Bar Association, the New York State Bar Association, and private CLE providers, as well as training seminars directed towards clients in the financial services industry where issues of New York Foreclosures, foreclosure related litigation, and legal compliance intersect. In my role as a partner, I am aware of the firm's fee arrangements with many of the Firm's clients, which follow the industry standards set by the government sponsored entities.

2) I make this affidavit with personal knowledge of the facts and circumstances herein which are derived from personal knowledge and/or an independent examination of the books and

business records made in the ordinary course of business maintained by or on behalf of the Firm to be an accurate and fair representation of the occurrences with which the record purports to represent as well as our notes and records relative to the within litigation. I am familiar with the record keeping and attorney note taking systems the Firm uses to record and create information related to the matters referred (hereinafter "matters") to the firm by its clients. Some of those processes require the employees of the Firm to manually enter data relating to matters on those systems. They have personal knowledge of that information and enter it into the system contemporaneous with the time they acquired that knowledge. The records relied upon are made in the regular course of business made at or about the time the event is being recorded, systematically made for the conduct of business and are relied upon as the accurate routine reflections of the day-to-day regularly conducted activity of providing the financial services industry with legal services and so the records may be relied upon as being truthful and accurate. In connection with making this affidavit, I have personally examined these business records reflecting data and information as of August 16, 2016.

3) I have reviewed the Firm's business records, attorneys' notes, and file related to the underlying foreclosures upon which the proposed amendment to the putative class action lawsuit arise, to wit: *KeyBank National Association v. Darlene V. Schmidt;* Supreme Court of the State of New York, Erie County, Index Number 2011605412.[1]

4) Our representation of KeyBank National Association (hereinafter "KeyBank") on mortgage foreclosure matters in New York started during or around March 2004.

---

[1] Your Affiant respectfully requests that this Court take judicial notice of certain facts that are a matter of public record. *See, e.g., DiBattista v. Buckalew, Frizzell & Crevina LLP*, 13-cv-01639, 2013 U.S. Dist. LEXIS 162704, *10, n. 3 *quoting Taha v. I.N.S.*, 828 F. Supp. 362, 362 n.2 *E.D. Pa. 1993).

5) As with all, or nearly all, of the firm's clients in the financial services industry, we have a written agreement with KeyBank that sets forth certain expectations, rights, duties, and obligations of the contracting parties. One of the contractual terms set forth are the flat fees that the client will pay the firm for services rendered.

6) While our contractual agreement with KeyBank has been updated, as have the contracts, over time, the amount of fees that the firm can charge on any given foreclosure is set by the contract.

7) Our contractual relationship with KeyBank began long before KeyBank referred a certain mortgage, given to them by Darlene V. Schmidt on September 14, 2007, for foreclosure. Indeed, the contractual relationship that we had with KeyBank preceded the existence of the Home Equity Line of Credit (hereinafter "HELOC") mortgage that was referred for foreclosure. A redacted copy of the mortgage in the amount of $35,000.00 encumbering the premises commonly known as 86 Wilshire Road, Cheektowaga, New York 14425, which was recorded in the Erie County Clerk's office on October 3, 2007, in Liber 13373 of Mortgages at Page 9773, is annexed hereto as Exhibit "A". Non-public private information (hereinafter "NPPI") and bar codes on the recorded HELOC mortgage have been redacted for the protection of Schmidt's NPPI.

8) Based upon my review of the contracts with KeyBank, said contracts being clearly labeled "PRIVELDGED & CONFIDENTIAL" so they cannot be disseminated without a waiver of the privilege from our client, the contract with KeyBank sets forth the flat fee we are allowed to charge them for a completed uncontested foreclosure. The contract and billing instructions from our client further sets forth a *pro rata* schedule that allows our firm to

charge our client, KeyBank, a certain *pro rata* percentage of the total fee upon reaching certain milestones.

9) Based upon the contracts, billing instructions, and internal records that Your Affiant reviewed, the firm would have been entitled to charge KeyBank a fee of $2,000.00 for a completed foreclosure in Upstate New York.[2] The milestone that was passed in this case was "Service Complete", which would have entitled the Firm to invoice KeyBank 70% of the full fee, or $1,400.00.[3]

10) The fees that KeyBank agrees to pay the firm are not contingent on whether the client can obtain reimbursement of those fees in a proceeding. Further, the fees are not dependent on the size of the mortgage, or anything else relating to the defendant. The firm does not negotiate the fees with its financial services clients. They are all sophisticated clients, with in house legal staffs. These clients advise the firm what they are willing to pay for services, and the firm either agrees to the rate, or does not provide services to the client. The firm's billings are carefully scrutinized, and the client will not pay for work that was not done.

11) The firm undergoes routine audits from its clients where many facets of its practice, including its billing practices and procedures are scrutinized by its clients' auditors to ensure that the firm is following the clients' expectations and best practices. Based upon my review of billing guidelines from its clients applicable at the time, the fees that the firm charged KeyBank related to the Schmidt matter, were at, if not under, the industry standard.

---

[2] Schmidt, through Attorney Williams, confirmed this amount as an industry standard rate. See Exhibits "H" pg. 6; Exhibits "H", "I", and "J".

[3] It should be noted that it appears that the firm billed KeyBank *less* than what it was entitled to bill by $140.00. Under the immediately previous billing guidelines where full fee was $1,800.00 and 70% thereof was $1,260.00.

12) After the Firm made a reasonable inquiry of the facts, reviewed title, reviewed certain loan documentation and history, and performed all of the work necessary to draft a Notice of Pendency, Summons & Complaint it did so and same were filed on October 4, 2011. Copies of the Notice of Pendency, Summons and Complaint are annexed hereto as Exhibit "B".

13) The Firm provided copies of the Summons and Complaint to a process service vendor to effectuate service of process.

14) The process service company employed by the firm on behalf of KeyBank personally served, in hand, Schmidt via N.Y. C.P.L.R. § 308(1), served three "John Doe" occupants via leave-and-mail service pursuant to N.Y. C.P.L.R. § 308(2), mailed an additional Summons as is required by N.Y. C.P.L.R. § 3215(g), and also mailed statutory notices via first class and certified mail, return receipt requested, to the occupants as required by N.Y. R.P.A.P.L. § 1303(5). The process service company engaged also effectuated the filing of the affidavits. Copies of the proof of service are annexed hereto as Exhibit "C".

15) Upon the completion of service, the process service company employed sent the Firm an invoice for $520.00. A copy of the invoice for service of process is annexed hereto as Exhibit "D".

   a. After reading the proposed amendment to the Complaint Your Affiant asked his process service vendor to provide a breakdown of how he calculated the invoice for $520.00.[4] A copy of the break down of the charge for services was provided and is annexed hereto as Exhibit "E".

---

[4] It should be noted that, despite the insinuation in proposed amended complaint paragraph 89 ("Nevertheless, Defendant failed to provide any documentation to support the claimed $520.00 service of process cost.") that Schmidt's Counsel, who is also Plaintiff's Counsel in this matter, never demanded proof of the cost. There is no allegation in the proposed amended complaint that proof of such cost was requested. Moreover, Your Affiant cannot find any such request anywhere in his file.

16) Before the Firm could file a Request for Judicial Intervention (hereinafter RJI), the Firm had to follow the Administrative Order 548/10 of then-Chief Administrative Judge Ann T. Pfau, as amended in Administrative Order 431/11. In sum and substance, the Administrative Order required certain certifications that a foreclosure attorney had to obtain from its client so it could file a certain form affirmation. The RJI could not be filed under the Administrative Order without the certification.[5]

17) The Firm received the certification from KeyBank on or about November 15, 2012, and sent the Affirmation required by the Administrative Order and the RJI for filing on December 6, 2012. Copies of the aforementioned Affirmation and RJI are annexed hereto as Exhibit "F".

18) Since the RJI requested a settlement conference pursuant to N.Y. C.P.L.R. § 3408, the State Court scheduled a Settlement Conference for January 11, 2013.

19) On December 28, 2012, the Firm was advised by its client to put its file on hold as the Plaintiff and Defendant were directly working with each other on loss mitigation.

20) Even though the Firm was asked by its client to put its file on hold, the Firm was required to prepare for and attend the settlement conference. The Firm discovered that Ms. Schmidt was working on a "re-age" plan[6]; and that she made the first of three payments of $427.89 to effectuate the re-age.

21) At the January 11, 2013, settlement conference, the Firm reported the foregoing information regarding the negotiations between its client and the Defendant to the Court.

---

[5] It should be noted that this process has since been replaced with a Certificate of Merit to be filed with the Complaint pursuant to N.Y. C.P.L.R. § 3012-b, which became effective on August 30, 2013.
[6] As Your Affiant understands the "re-age" plan, generally, the lender puts the foreclosure of the HELOC mortgage on hold for approximately 90 days to give a borrower and opportunity to make three payments. If the payments are made timely, then certain amounts that the lender chooses to recover are rolled back into the principal balance of the line of credit and the account is considered current. Once the re-age is completed, the foreclosure is to be closed.

Attorney Amy Gathings appeared for Schmidt and asked for a copy of the re-age paperwork, if any, and asked for the matter to be adjourned. The settlement conference was adjourned to March 4, 2013.

22) KeyBank closed our file on February 19, 2013. However, since the settlement conferences were ongoing, we were required to continue to prepare for and attend them.

23) At the March 4, 2013, settlement conference, the Firm advised the Court that the re-age was completed and the account was considered current by KeyBank. Attorney Keisha Williams appeared and would not allow the settlement conference to be concluded or the action to be discontinued. She demanded production of the re-age paperwork and the conference was adjourned to April 8, 2013.

24) On March 7, 2013, Attorney Williams called the Firm and spoke with one of the Firm's legal assistants (Paul Beverly). Attorney Williams was advised that KeyBank would send the papers directly to her client and that we did not have them. Attorney Williams stated she had a bank contact and hung up the phone.

25) On or about March 29, 2013, KeyBank approved the Firm's request for authorization to invoice it for $300.00 in attorneys' fees to prepare, obtain, file, scan, and preserve the necessary paperwork to discontinue the action.

26) Prior to the April 8 conference, the Firm was unable to obtain the documents requested by Schmidt's attorneys. Attorney Keisha Williams appeared on behalf of Schmidt and stated that she contacted KeyBank directly[7] and received the figures she was seeking from them.

---

[7] Your Affiant's file is bereft any indication that the firm gave Attorney Williams permission to contact its client directly on this matter. Despite apparently not having the consent of the attorneys representing a party to an action, Attorney Williams contacted KeyBank, a represented party, directly. See 22 NYCRR § 1200.0, Rule 4.2.

Attorney Williams then stated she wanted to discuss fees and disbursements. The settlement conference was adjourned to May 13, 2013.

27) On or about April 17, 2013, the Firm sent Keisha Williams a consent form to discontinue the foreclosure action for her signature and return.

28) Keisha Williams called the Firm and spoke with Legal Assistant Bryan Jones, confirmed that she received the consent and stated that she wanted a breakdown of attorneys' fees for which the client was seeking reimbursement. She indicated she would provide us with a written request. A copy of that request is annexed hereto as Exhibit "G".

29) To be able to comply with the request, the Firm needed additional information from its client.

30) During the May 13, 2013, settlement conference, Attorney Keisha Williams appeared on behalf of Ms. Schmidt. Ms. Williams stated that she had communicated directly with a representative of KeyBank[8], who, she alleged, instructed her that any breakdown of fees and costs that the firm charged KeyBank must come from the Firm. The matter was adjourned to May 31, 2013.

31) The May 31 conference was adjourned to July 15, 2013. The firm did not know what KeyBank charged to Ms. Schmidt's account and, accordingly, could not provide a breakdown. It was not until on or about June 12, 2013, that the Firm received a breakdown of $9,664.53 that appeared to have been included in the re-age. A copy of the breakdown was annexed to the proposed amended Complaint as Exhibit "H"[9].

---

[8] Again, Your Affiant sees no note or writing in the Firm's file that indicates that Ms. Williams was given permission to communicate directly with the client being represented by the Firm.

[9] It should be noted that there are clearly items that were included that are not attributable to the firm. For example, a BPO is a Broker's Price Opinion, or a valuation that a lender's vendor gives after visiting the premises and looking at comparable properties with recent sales. The firm does not perform these services for any of its clients. Also, the "Reage deferment" is clearly not an attorney fee or cost. At most, the "Attorney Fees and Costs" appear to be the only item listed on Plaintiff's Exhibit "H" that could be attributable to the Firm.

32) At the July 15, 2013, conference, Attorney Williams requested written confirmation of the breakdown of the "Outstanding Legal Fees and Costs" (Plaintiff's proposed amended Complaint, Exhibit "G").

33) The Firm obtained additional information from its client leading the Firm to believe that the "Outstanding Legal Fees and Costs" of $9,664.53 as listed in proposed Amended Complaint Exhibit "G" Keybank should have been $3,443.56. It appeared that amount included a $34.00 Broker's Price Opinion, and a reconveyance fee of $50.50 in the "Outstanding Legal Fees and Costs", even though those services were not performed by the Firm, not billed to KeyBank by the Firm, and are not fees or costs accrued by the Firm.

34) At the request of Attorney Williams at the July 15, 2013, conference, the Firm provided her with the breakdown and calculation of the $3,443.56 that KeyBank listed as "Outstanding Legal Fees and Costs." See proposed Amended Complaint, Exhibit "I".

35) Another copy of the consent to discontinue the action was mailed to Attorney Williams on August 6, 2013.

36) After review of the breakdown of the "Outstanding Legal Fees and Costs" and at an August 9, 2013, conference in the presence of the Court via Confidential Law Clerk Jennifer Runfola, Attorney Williams confirmed that she was satisfied with the breakdown provided, but that she alleged that KeyBank's billing statement was not correct. The conference was continued to September 20, 2013, to give KeyBank an opportunity to correct its billing statement.

37) The form for Attorney Williams to consent to discontinue the action was re-sent to Attorney Williams on August 20 and September 5, 2013.

38) On September 10, 2013, Attorney Williams called the Firm and advised that she refused to consent to discontinue the action unless and until the client reduced the amount of attorneys' fees to be paid as part of the re-age.

39) At the September 20, 2013, conference, Attorney Williams reported that KeyBank did not correct Schmidt's statement; that no such change occurred on Schmidt's September statement; that she contacted KeyBank directly to ask why[10]; and suggested that KeyBank told her that nobody from the Firm told them to change the statement. Attorney Williams was reminded at the conference that she should not be contacting KeyBank directly since they were represented by Counsel. The conference was adjourned to November 15, 2013.

40) On September 26, and October 15, 2013, legal assistants Bryan Jones and Jessica Ellis called and left one message on each day for Attorney Williams to follow up on the consent to discontinue the action and left a voicemail. The form for Attorney Williams' consent to discontinue the action was re-sent to her on October 24 and November 9, 2013. Attorney Williams did return the phone call and left a voicemail message.

41) Instead of consenting to discontinue the action, Attorney Williams, on behalf of Ms. Schmidt, filed a motion to bar KeyBank from recovering more than $150.00 in attorneys' fees and costs and to award Schmidt's Attorneys' fees and costs. A copy of Schmidt's motion, with NPPI redacted[11], is annexed hereto as Exhibit "H".

---

[10] Again, without the permission of the Attorneys representing KeyBank on the matter.
[11] Schmidt's Counsel filed the motion with exhibits that contained private and sensitive information like Schmidt's KeyBank account number for her home equity line of credit throughout several exhibits and her phone number provided to Attorney Williams in an e-mail that would otherwise appear to be an attorney-client privileged communication. It should be noted that Attorney Williams had her client's e-mail address redacted in Exhibit "N" of the motion before filing the motion, even though she left the loan number and personal phone number of her client in the exhibits. Your Affiant has redacted the account numbers and phone number from the exhibits of the motion so as not to exacerbate the risk of identity theft and damage to which Attorney Williams exposed her client.

42) On November 22, 2013, the Firm sent Attorney Williams an e-mail (Plaintiff's proposed Amended Complaint Exhibits "J" and "K") that explained certain items that the Firm charged to KeyBank that KeyBank routinely does not seek reimbursement from their borrowers. For reasons unknown to the firm, KeyBank apparently included certain items it usually considers to be "non-recoverable"[12].

43) Schmidt's motion was originally returnable on December 6, 2013. However, there was a return before the Court with Confidential Law Clerk Dan Furlong, presiding, on December 20, 2013. Attorney Williams stated that $2,000.00 in fees and costs were more equitable than the $3,359.06 in fees and disbursements charged to KeyBank and previously itemized by the firm in August 2013. The motion was ultimately adjourned to February 28, 2014, to allow the parties an opportunity to resolve the remaining issues.

44) The staff within the Firm who work on discontinuances sent the form for Attorney Williams to consent to discontinue the action on December 2 and 17, 2013, January 6, 21, and February 10, 2014.

45) On February 14, 2014, Attorney Vikram S. Vilkhu, of the Firm, had a telephonic conference with Attorney Williams to discuss the matter. A corrected January 2014 monthly billing statement and the previous breakdown of the Firm's fees and costs charged to KeyBank were discussed. Attorney Williams agreed with our position and stated she would withdraw her motion once she discussed same with her client.

---

[12] Many of the Firm's clients make or have made business decisions to refrain from charging their customers certain fees and/or disbursements. For example, the Firm may earn a fee for filing certain information with the Department of Financial Services (DFS) pursuant to N.Y. R.P.A.P.L. § 1306 and DFS regulations that require filings within a short period of time after a 90-day notice is mailed, after a Complaint is filed, and after a Judgment is entered. While the Firm's clients will pay the Firm for filings with the DFS, which is necessary to maintain compliance with statute and regulation, some clients make a business decision to forego billing those amounts back to the borrower.

46) On February 27, 2014, Attorney Williams advised the Court, via Confidential Law Clerk Dan Furlong in an e-mail, that "Mr. Vilkhu and I were able to resolve the outstanding issues" and that she executed and returned the consent to discontinue the action. A copy of Attorney Williams's e-mail is annexed hereto as Exhibit "I".

47) The discontinuance of the foreclosure action was filed on or about March 20, 2014, after the Firm received Attorney Williams's consent to discontinue the action. A copy of the filed discontinuance is annexed hereto as Exhibit "J".

WHEREFORE, your deponent respectfully prays for an order denying Plaintiff's motion to amend the Complaint, and grant any further relief that the court may deem just and proper.

By: _____
David. P. Case, Esq.

Sworn to before me this
16th day of August, 2016.

_____
Notary Public

ERIKA ANNE MUSSO
Notary Public, State of New York
Qualified in Monroe County
No. 01MU6289358
Commission Expires September 23, 20 17