UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**CHRISTOPHER WHITE and WILLIAM**
**SUITOR, and DARLENE SCHMIDT,**
**individually and on behalf of all others similarly**
**situated,**

*Plaintiffs,*

*vs.*

**Fein, Such & Crane, LLP,**

*Defendant.*

_____

**AFFIDAVIT**

Civil Action No.
15-cv-00438

| STATE OF NEW YORK | ) | |
| COUNTY OF MONROE | ) | ss.: |
| | ) | |

David P. Case, Esq. being duly sworn, deposes and says:

1)      I am a Partner of Fein, Such and Crane, L.L.P (hereinafter "the Firm"). I have

been with the Firm since 2002. My career has been spent representing the financial services

industry, focusing on New York Foreclosures, post-foreclosure evictions, and contested

litigation. I have lectured in many seminars directed towards attorneys for continuing legal

education for the Monroe County Bar Association, the New York State Bar Association, and

private CLE providers, as well as training seminars directed towards clients in the financial

services industry ("bank clients") where issues of New York Foreclosures, foreclosure related

litigation, and legal compliance intersect. In my role as a Partner, I am aware of the Firm's fee

arrangements with many of the Firm's bank clients, which follow the industry standards set by

the government sponsored entities.

2)      I make this affidavit based upon knowledge of the facts and circumstances set

forth herein, which are derived from personal knowledge and/or an independent examination of

the books and business records of the Firm which were made in the ordinary course of business and/or are maintained by or on behalf of the Firm.  These books and business records are an accurate and fair representation of the occurrences with which the record purports to represent as well as our notes and records relative to the within litigation.

3)      I am familiar with the record keeping and attorney note taking systems which the Firm uses, and has used over time, to record and create information related to the matters referred to the Firm ("matters") by its bank clients.   Some of those processes require the employees of the Firm to manually enter data relating to matters on those systems.   The employees who enter the data have personal knowledge of that information and enter it into the system contemporaneous with the time they acquired that knowledge.

4)      The books and business records reviewed are made in the regular course of business, are made at or about the time the event is being recorded, are systematically made for the conduct of business, and are relied upon as the accurate routine reflections of the day-to-day regularly conducted activity of providing the Firm's bank clients with legal services.  Accordingly, the records may be relied upon as being truthful and accurate.

5)      In connection with making this Affidavit, I have personally examined the Firm's books and business records reflecting data and information as of July 27, 2017.  In this context, I reviewed the Firm's business records, attorneys' notes, and files related to the underlying foreclosures upon which the Amended Complaint are based, to wit: *HSBC Bank USA., N.A., v. Christopher M. White a/k/a Christopher White*, et al; County Court of Erie County, Index No. 2013-605767; *HSBC Bank USA, N.A., v. William T. Suitor, et al;* Supreme Court of the State of New York, County of Niagara, Index No. E150988-2013;  and *KeyBank National Association v.*

*Darlene V. Schmidt;* Supreme Court of the State of New York, Erie County, Index Number

2011605412[1] (collectively, the "Underlying Related Foreclosure Actions").

<u>The Firm's Clients in the Underlying Related Foreclosure Actions and the Fee Structure.</u>

6)     The Firm's representation of HSBC Bank USA, N.A., (hereinafter "HSBC")

began during or around December 2003.

7)     The Firm's representation of KeyBank National Association (hereinafter

"KeyBank") on mortgage foreclosure matters in New York began during or around March 2004.

8)     The Firm has written agreements with HSBC and KeyBank that set forth certain

expectations, rights, duties, and obligations of the contracting parties.  Included in the contractual

terms are the flat fees that these clients will pay to the Firm for services rendered.

9)     While the Firm's contractual agreements with HSBC and KeyBank are updated

from time to time, the amount of fees that the Firm can charge on any given foreclosure remains

set by the contractual agreements.

10)     HSBC has asked the Firm to maintain our agreement with it as confidential.

Therefore, in order to respond to discovery, I approached the attorneys for HSBC and obtained

permission to release a redacted version of the agreement, which, on information and belief, was

produced to Plaintiffs' counsel in response to Plaintiffs' Request for Production of Documents.

The contract with HSBC requires that the Firm's fees be within Government-Sponsored Entity

guidelines setting the flat fees for uncontested foreclosures set forth by the Federal National

Mortgage Association in effect at the time of the referral or, where such flat fee is revised, then

as to the effective date of the revised fee, unless otherwise approved by HSBC—which would

---

[1]     Your Affiant respectfully requests that this Court take judicial notice of certain facts that
are a matter of public record. *See, e.g., DiBattista v. Buckalew, Frizzell & Crevina LLP*, 13-cv-
01639, 2013 U.S. Dist. LEXIS 162704, *10, n. 3 *quoting Taha v. I.N.S.*, 828 F. Supp. 362, 362
n.2 *E.D. Pa. 1993).

include certain services not covered by the flat fee, such as certain contested litigation. Billing guidelines provided to the Firm required the Firm to invoice *pro rata* amounts of the uncontested flat fee based upon certain milestones including, but not limited to, the preparation of the Complaint, service of process completed, application for Order of Reference prepared and/or filed, and sale scheduled.

11)     Similarly, KeyBank has requested confidential treatment of its agreements with the Firm. Although Plaintiff's counsel in this case did not request the production of agreements with KeyBank, I nonetheless went through the same vetting process as set forth above with respect to the HSBC contract. The contract with KeyBank also sets forth the flat fee the Firm is allowed to charge the bank for a completed uncontested foreclosure. The contract and billing instructions from the Firm's client further sets forth a *pro rata* schedule that allows the Firm to charge our client, KeyBank, a certain *pro rata* percentage of the total fee upon reaching certain milestones.

12)     Indeed, at the time of the Underlying Related Foreclosure Actions, the market and industry norm for the financial services industry was to follow the fees set by Fannie Mae[2] and then invoice the client certain percentages at certain milestones. This remains the case today.

13)     The fees that the Firm's bank clients, including HSBC and KeyBank, agree to pay the Firm are not contingent on whether the client obtains reimbursement of those fees in a proceeding or a negotiated settlement. Indeed, if a property is lost to an *in rem* tax foreclosure or foreclosure of a senior-in-position lien, the Firm is paid by its client. If a Firm client negotiates a loan modification, short sale, or a Deed-In-Lieu, the Firm gets paid the fees allowed by the

---

[2]     Except on Freddie Mac files, where Freddie Mac has its own fee guideline, and foreclosures where the mortgage is backed by a VA, FHA, or USDA insurance policy where those Governmental Departments set the fees.

contracts even if the client is not reimbursed for those fees.[3]  If a Firm client sells the mortgage to another servicer (whether or not for a discount), the client pays the Firm the fees it is entitled to up to the date of the release of the mortgage.

14)     Further, the attorneys' fees charged on foreclosure matters to our bank clients are not dependent on the size of the mortgage or anything else relating to the defendant in any given foreclosure, with the exception of the geographic location of the property.   In other words, assuming both mortgages are in the same area of the State, the Firm must follow the same fee schedule regardless of whether the foreclosure involves a $30,000.00 mortgage or a $530,000.00 mortgage.  Any allegations to the contrary in the Plaintiffs' Amended Complaint are flatly false, and the Firm's attorneys in this matter have pointed this out to them, yet they contain to make these allegations.

15)     The Firm's bank clients are all sophisticated financial services industry clients. The Firm does not, and practically cannot, negotiate the fees with its bank clients.  Clients within the financial services industry advise the Firm what they are willing to pay for services, and the Firm either agrees to the rate, or does not provide services to the client.

16)     The Firm has no control over what fees, costs and disbursements its bank clients may seek to recover through mortgage foreclosure or from a mortgagor through a reinstatement, payoff, short sale, loan modification, forbearance payment plan, or Deed-In-Lieu.  The amount that a bank client seeks to recover is within the sole discretion of the client.

17)     The Firm undergoes routine, if not yearly, audits from its bank clients where many facets of the Firm's practice, including its billing practices and procedures, are scrutinized by its clients' auditors to ensure that the Firm is following its clients' expectations and best

---

[3]     As is directly the case in the White foreclosure where the Firm's bank client was invoiced more in fees than the $1,500.00 that Mr. White and HSBC agreed to be recoverable through the loan modification agreement.  See Exhibits "D", "E", and "F".

practices. The Firm's billings are carefully scrutinized by its clients, and the Firm's clients will not pay for work that was not done or for fees or costs that are not sufficiently supported by either the agreements the Firm has with its clients or by back-up documentation. In the extreme rare instance that an anomaly in the invoicing is found, the Firm would be asked to reimburse its client for the difference in the incorrectly billed amount and what should have been billed.[4] The allegations in Plaintiffs' Amended Complaint that the Firm's clients (such as HSBC and KeyBank) pay the Firm for services it does not perform is simply untrue.

<u>Electing the Remedy of Foreclosure Versus the Collection of a Debt.</u>

18) As set forth more fully in the accompanying Memorandum of Law, when the underlying loan is in default, a mortgagee who holds a note that is secured by a mortgage cannot, under New York law, simultaneously seek to collect a money judgment based upon the Note and also foreclose out title through a mortgage foreclosure action. The mortgagee must elect its remedy to seek redress through Note enforcement <u>or</u> foreclosure of the mortgage.

19) While the Firm provides a variety of litigation and support services to the financial services industry (like foreclosure, title curative work within and without litigation, representation in Bankruptcy Court, post-foreclosure evictions, closing of real estate sales), it does not commence actions to sue on a Note; rather, it forecloses on the mortgage. Indeed, in being with the Firm for fifteen years in September, 2017, Your Affiant does not recollect having even one matter referred to the Firm for the collection on the Note[5].

---

[4]      Conversely, it should be noted that where a billing anomaly is found to be in the bank's favor, Counsel is not paid the difference between what was billed and what should have been billed to its client.

[5]      Indeed, Your Affiant does recollect matters where its bank clients have lost a property to tax foreclosure or there was a fatal flaw in title rendering the mortgage unenforceable. While those clients would have had, in those circumstances, the option of suing on the Note, that avenue is travelled by another line of business within the clients. The Firm does not and would not get that work or referral.

20)     In each of the Underlying Related Foreclosure Actions, the Firm's clients elected the remedy of foreclosure and referred the matters to the Firm for foreclosure, and not to collect a money judgment.  Thus, any acts of the Firm complained of were solely within the context of the above-referenced foreclosure proceedings.

21)     The correspondence sent by the Firm and complained of in the Amended Complaint was sent in the context of settlement conferences mandated under N.Y. C.P.L.R. § 3408 and, thus, were part of the foreclosure proceedings.  Moreover, this correspondence was sent by the Firm to foreclosure defense counsel for the Plaintiffs, and not to the mortgagors themselves, in response to communications initiated by Plaintiff's foreclosure defense counsel.

22)     As set forth in the accompanying Memorandum of Law, Your Affiant believes that the Firm is not a debt collector for purposes of the FDCPA, and the Firm's acts in prosecuting the foreclosure actions and negotiating amicable resolution through a statutorily-mandated court-supervised settlement conference process and communicating with the Plaintiffs' attorneys regarding same is not a debt collection for purposes of the FDCPA.

<u>Christopher White</u>

23)     On June 10, 2004, Christopher White entered into a written agreement with HSBC concerning the property commonly known as 384 Walnut Street, Buffalo, New York 14211.  A redacted[6] copy of the June 10, 2004 mortgage in the amount of $95,000.00 encumbering the property is annexed hereto within Exhibit "A" at Schedule "D."

24)     Thereafter, on information and belief, Mr. White defaulted on his agreement with HSBC, and the matter was referred to the Firm for foreclosure.

---

[6]     Non-public private information (hereinafter "NPPI") and bar codes on the recorded mortgage have been redacted for the protection of Mr. White's NPPI.

25)    After the Firm made a reasonable inquiry of the facts, reviewed title, reviewed

certain loan documentation and history, and performed all of the work necessary to draft a Notice

of Pendency, Summons and Complaint, it did so and the same were filed on September 23, 2013.

*See* Exhibit A; *see also* Amended Complaint (Docket Document No. 45) at ¶ 57.

26)    Mr. White was not a client of the Firm, nor did he purchase any goods or services

from the Firm.   To the contrary, Mr. White was a defendant in a lawsuit the Firm was

prosecuting[7] on behalf of its client, HSBC.

27)    At no time following the commencement of the foreclosure proceeding did the

Firm communicate with or solicit Mr. White to sell him any goods or services.

28)    By the terms of his agreement with HSBC, Mr. White agreed to pay, among other

things, reasonable attorneys' fees incurred by the bank in connection with any foreclosure

proceeding.  *See, e.g.,* Exhibit A, Schedule D, ¶ 22 (pp. 14-15) ("In any lawsuit for Foreclosure

and Sale, Lender will have the right to collect all costs and disbursements and additional

allowances allowed by Applicable Law and will have the right to add all reasonable attorneys'

fees to the amount I owe Lender, which fees shall become part of the Sums Secured.").

29)    Subsequently, the firm was notified by the Erie County Court that a foreclosure

settlement conference under N.Y. C.P.L.R. § 3408 was scheduled for November 22, 2013, which

---

[7]    The adversarial nature of a lawsuit between two parties is important to note.   The
underlying policy implications of Plaintiffs' lawsuit against the Firm ought to be extremely
concerning to the practicing bar as a whole.  Whether or not in an FDCPA or a GBL § 349 claim,
Plaintiffs seek redress against their adversaries' attorneys after the parties amicably settled their
matters—and, with respect to Mr. White, after the parties to the underlying foreclosure
proceeding agreed to a set amount of $1,500.00 in fees to be recovered through a loan
modification.  Thus, any relief to the Plaintiffs in this action opens the door for a litigant to sue
their adversary's attorney where the adversary is entitled, by contract or statute, to its attorneys'
fees and that litigant seeks to recover those fees.

was administratively adjourned to December 13, 2013[8].  *See also* Amended Complaint (Docket Document No. 45) at ¶ 57.

30)   At the December 13, 2013, §3408 settlement conference, attorney Marc Conners, Esq., of the Legal Aid Bureau appeared with and on behalf of Mr. White.  The matter remained in foreclosure settlement conferences for several months with Attorney Keisha Williams, Esq., of the Western New York Law Center ("WNYLC") taking over the representation of Mr. White.

31)   N.Y. C.P.L.R. § 3408(e)[9] required the foreclosing mortgagee's counsel to bring certain documents, including "an itemization of the amounts needed to cure and pay off the loan…"  Such a requirement means the foreclosing plaintiff must bring reinstatement figures (to cure the default in the loan) and payoff figures (to pay off the loan).

32)   Accordingly, it is my understanding that payoff and reinstatement figures prepared for settlement conferences are and were required by State law as part of the continuation of the foreclosure action.

33)   The Firm subsequently received a request from Mr. White's counsel (WNYLC, through its employee Valerie Malia) for reinstatement figures.  In response to WNYLC's request, the Firm on January 13, 2014 sent the reinstatement figures by facsimile to the attention of Valerie Malia at WNYLC.  *See* Amended Complaint (Docket Document No. 45) at Exhibit B. The January 13, 2014 letter was sent by my Firm to WNYLC, and <u>not</u> to Mr. White.

---

[8]     It should be noted by the time of the December 13, 2013, settlement conference; HSBC paid the Firm approximately $3,082.56 in attorneys' fees and disbursements advanced on behalf of HSBC.

[9]     Section 3408 was amended effective December 20, 2017, but the requirement remains the same.

34)     From January through March 2014, Mr. White's attorneys provided the Firm with certain financial documentation needed by HSBC's loan servicer to consider the borrower for a loan modification[10] agreement.

35)     At its client's request, the Firm's file went on hold in March 2014 to allow Mr. White to complete a three month pre-loan modification trial plan.

36)     On or around June 18, 2014, Mr. White completed the three month trial plan and was offered a loan modification by the HSBC. *See* Amended Complaint (Docket Document No. 45) at ¶ 58.

37)     In response to additional requests to the Firm by WNYLC for further information (further description or explanation of the Outstanding Incurred Fees and Costs, the Outstanding Estimated Fees and Costs, and the Mortgagor Recoverable Corporate Advance listed in the aforementioned January 13, 2014, letter), the Firm faxed to Mr. White's counsel (again to the attention of Valerie Malia), the March 26, 2014 correspondence included within Exhibit B to the Amended Complaint.  The March 26, 2014 letters were sent by my Firm to WNYLC, and not to Mr. White.

38)     On or about April 25, 2014, the Firm received a letter from Attorney Williams objecting to the fees and costs that HSBC sought to recover and as listed in the March 26, 2014, letters.  A true and correct copy of Attorney Williams's April 25, 2014, letter is annexed hereto as Exhibit "B".

39)     At the June 30, 2014, settlement conference appearance, Attorney Williams wanted to understand a breakdown of the fees that HSBC had included in its loan modification

---

[10]     A loan modification is where the mortgagor and mortgagee agree to renegotiate the terms of the mortgage and recast the mortgage with new terms.  Terms that are likely to change are the interest rate, the principal balance, the monthly payment to be due under a modified agreement, and the maturity date.

offer. Attorney Williams followed up with the Firm in an e-mail asking for a detailed breakdown of the fees and costs HSBC was seeking to recover through the loan modification agreement. The Firm reached out to its client for the information Attorney Williams had requested, and the Firm responded to her request with the July 3, 2014, letter included within Exhibit B of the Amended Complaint. The July 3, 2014 letter was sent by my Firm to WNYLC, and not to Mr. White.

40)   HSBC offered Mr. White a loan modification agreement (see Amended Complaint Exhibit "C"). On information and belief, HSBC sent or caused to be sent the loan modification agreement directly to the mortgagor, the contents of which Mr. White, on information and belief, did not dispute. The Firm did not send the loan modification agreement to Mr. White.

41)   Attorney Williams brought a motion, originally returnable on August 25, 2014, to have the Erie County Court determine that HSBC had not negotiated in good faith and to forever bar HSBC from collecting or charging Mr. White any "unsubstantiated attorneys' fees [and] out-of-pocket expenses or costs." A true and correct copy of the aforesaid motion is annexed hereto as Exhibit "C".

42)   The Firm responded to the motion and Attorney Williams replied and the Firm sent Attorney Williams a *quantum meruit* fee affirmation.

43)   Ultimately, Attorney Keisha Williams, on behalf of Mr. White, negotiated with the Firm, on behalf of its client, to resolve the final issue where only attorneys' fees of $1,500.00 and costs/expenses in the amount of $2,800.00 would be recapitalized into a loan modification agreement[11]. HSBC accepted her offer to further compromise and we advised Attorney Williams

---

[11]    It should be noted, here, that HSBC paid the firm a total of $11,136.56 in attorneys' fees and reimbursed advances, but only recovered a total of $4,300.00 from Mr. White through the loan modification agreement.

13699337.2

of our client's acceptance. A copy of a January 7, 2015, letter confirming that HSBC was accepting Attorney Williams's offer, made on behalf of her client, is annexed hereto as Exhibit "D." A copy of Attorney Williams's January 13, 2015, letter confirming the negotiated settlement is annexed hereto as Exhibit "E."

44) While the Firm's bank client negotiated and agreed to accept a reduced recovery of attorneys' fees and costs, the Firm was paid the full amount of its fees by its client. (See fn. 11).

45) The loan modification agreement was amended by the Firm's bank client to reflect the negotiated settlement, including those negotiated fees and costs HSBC would recover through the modified and recast loan. The Firm transmitted the new loan modification agreement to Attorney Williams on May 11, 2015. A copy of the transmittal cover letter and the loan modification agreement is annexed hereto as Exhibit "F."

46) Attorney Williams withdrew the motion. A copy of the withdrawal letter is annexed hereto as Exhibit "G."

47) In a final appearance on the foreclosure matter to confirm that White's motion for relief against HSBC to bar them from collecting certain attorneys' fees and costs, Attorney Williams advised the Court that, even though the issues related to the fees and costs recovered by HSBC in the loan modification where agreed to, she filed a "cross-action" against Fein, Such & Crane, L.L.P. A copy of the transcript is annexed hereto as Exhibit "H".

<u>William Suitor</u>

48) On November 8, 2004, William T. Suitor and Jennifer R. Suitor entered into an agreement with HSBC concerning a parcel of real property commonly known as 212 Elliot

Street, Youngstown, New York 14174.  A redacted[12] copy of the mortgage in the amount of $70,483.00 encumbering the premises is annexed hereto as Exhibit "I," Schedule "D."

49)     Thereafter, Mr. and Mrs. White, on information and belief, defaulted on their agreement with HSBC, and the matter was referred to the Firm for foreclosure.

50)     After the Firm made a reasonable inquiry of the facts, reviewed title, reviewed certain loan documentation and history, and performed all of the work necessary to draft a Notice of Pendency, Summons and Complaint, it did so and the same were filed on September 5, 2013. *See* Exhibit I; *see also* Amended Complaint (Docket Document No. 45) at ¶ 64.

51)     Mr. and Mrs. Suitor were not clients of the Firm, nor did they purchase any goods or services from the Firm.  To the contrary, Mr. and Mrs. Suitor were defendants in a foreclosure proceeding the Firm was prosecuting on behalf of its client, HSBC.

52)     At no time did the firm communicate with or solicit the Suitors to sell them any goods or services.

53)     By the terms of their agreement with HSBC, Mr. and Mrs. White agreed to pay, among other things, reasonable attorneys' fees incurred by the bank in connection with any foreclosure proceeding.  *See, e.g.,* Exhibit I, Schedule D, ¶ 22 (pp. 14-15) ("In any lawsuit for Foreclosure and Sale, Lender will have the right to collect all costs and disbursements and additional allowances allowed by Applicable Law and will have the right to add all reasonable attorneys' fees to the amount I owe Lender, which fees shall become part of the Sums Secured.").

54)     Mr. and Mrs. Suitor answered the foreclosure Complaint and then amended their answer within the time period prescribed by New York law to do so as of right.  A copy of the Amended Answer is annexed hereto as Exhibit "J."

---

[12]     *See* fn. 6.

55)     The Firm was notified by New York State Supreme Court in Niagara County that a foreclosure settlement conference under N.Y. C.P.L.R. § 3408 was scheduled for October 24, 2013[13]. A copy of the notification of the Settlement Conference is annexed hereto as Exhibit "K."

56)     At the October 24, 2013, §3408 settlement conference, neither of the Suitors, nor an attorney on their behalf, appeared and the matter was released from settlement conferences.

57)     Four days later, the New York State Supreme Court in Niagara County issued a new settlement conference notification scheduling a settlement conference for November 14, 2013. A copy of the second settlement conference notification is annexed hereto as Exhibit "L."

58)     At the November 14, 2013, settlement conference, Attorney Daniel Webster, who was part of the Foreclosure Prevention Project in conjunction with Attorney Keisha Williams's employer, Western New York Law Center, appeared on behalf of the Suitors. The settlement conference was adjourned to February 13, 2014, to give Attorney Webster an opportunity to assist his clients in submitting a completed loan modification application package.

59)     Like in the White matter, N.Y. C.P.L.R. § 3408(e) required the foreclosing mortgagee's counsel to bring certain documents, including "an itemization of the amounts needed to cure and pay off the loan... ." Your Affiant interprets such a requirement to mean reinstatement figures (to cure the default in the loan) and payoff figures (to pay off the loan).

60)     The settlement conferences continued for several months with all of the Firm's communications being with its client and with Attorney Webster. At no time during Attorney Webster's representation of the Suitors did the Firm contact the mortgagors.

---

[13]     Before the first settlement conference, which occurred on October 24, 2013, the Firm was paid $2,435.56 in attorneys' fees and costs by its client.

61)     On information and belief, HSBC offered Mr. and Mrs. Suitor a loan modification agreement, which, upon information and belief, the Suitors accepted and returned back to HSBC. *See* Amended Complaint Exhibit C.  The Firm did not transmit the loan modification agreement to Mr. and Mrs. Suitor directly or indirectly.  The Firm did not transmit the loan modification agreement to Attorney Webster.  On information and belief, HSBC mailed the loan modification agreement directly to the Suitors.

62)     Contemporaneously, Attorney Webster inquired about the calculation of the new principal balance in an August 8, 2014, letter.  *See* Amended Complaint Exhibit "D".

63)     On August 14, 2014 the Firm, through Attorney V.S. Vilkhu, responded to the letter.  *See* Amended Complaint Exhibit "E".

64)     Attorney Webster did not respond in writing to challenge or question the breakdown and explanation provided in Attorney Vilkhu's letter.

65)     On January 2, 2015 Attorney Webster consented to discontinue the Suitor Foreclosure action.  A copy of the filed discontinuance is annexed hereto as Exhibit "M". Attorney Webster provided consent to discontinue following the Firm's continued communications with Attorney Webster from October 21, 2014, and an appearance in Niagara County Supreme Court.

66)     I have reviewed Exhibit "F" of the Amended Complaint, which appears to be a letter from HSBC to Mr. Suitor.  HSBC did not send that letter to the Firm—especially since our file was closed at that point—nor had the Firm received that letter prior to being served with the Complaint in this action.  I note that in that letter HSBC only references "certain fees and/or costs" that were refunded in the amount of $2,701.35 ($2,629.59 plus interest).  Yet, I notice that Plaintiff's Counsel automatically, and incorrectly, infers that those fees and costs were attorneys' fees and costs "unlawfully collected for services not actually rendered in Mr. Suitor's foreclosure

action." *See* Amended Complaint at ¶ 77.  The Firm was paid a total of $7,028.15 in attorneys' fees and disbursements made on behalf of its bank client.  The Firm did not refund any of the funds it was paid back to HSBC.  It should be noted in the loan modification agreement, which was not prepared by the Firm, a total of $5,515.59[14] was recaptured into the loan modification agreement for "Attorney Fees/costs" and "Recoverable Advances."  *See* Amended Complaint Exhibit "C."  Yet, HSBC appears to have refunded Suitor $2,701.35.  *See* Amended Complaint Exhibit "F."

67)     It is simple elementary arithmetic that shows that what HSBC chose to recover through the loan modification (and the subsequent refund) is completely and wholly separate from what the Firm billed to its bank client.[15]

Darlene Schmidt

68)     On September 14, 2007, Darlene V. Schmidt entered into an agreement with KeyBank encumbering the premises commonly known as 86 Wilshire Road, Cheektowaga, New York 14425.  A redacted[16] copy of the mortgage in the amount of $35,000.00 is annexed hereto as Exhibit "N," Schedule "D."

---

[14]     Paragraph 69 of the Amended Complaint patently incorrectly states that "$15,520.88 in fees and costs were capitalized and added to his loan."  Exhibit "C" of the Amended Complaint belies such an allegation.  Of the $15,520.88 that appears to have been re-capitalized, it appears that HSBC included $5,547.24 of accrued interest and $4,458.05 in Escrow Advances (*i.e.* taxes and/or hazard insurance paid by the bank).  Interest and escrow advances are not "fees and costs."  Plaintiff cavalierly disregards the differences between accrued interest and advances for escrow with "fees and costs."

[15]     The Firm was paid $7,028.15 in fees and disbursements.  According to Plaintiffs' Amended Complaint, assuming the refund was comprised of fees and costs paid to the Firm, HSBC only recovered a net of $2,814.24 in fees and costs paid to the Firm.

[16]     *See* fn. 6.

69)     Thereafter, Ms. Schmidt, on information and belief, defaulted on her agreement
with KeyBank, and the matter was referred to the Firm for foreclosure.

70)     After the Firm made a reasonable inquiry of the facts, reviewed title, reviewed
certain loan documentation and history, and performed all of the work necessary to draft a Notice
of Pendency, Summons and Complaint, it did so and the same were filed on October 4, 2011.
*See* Exhibit N; *see also* Amended Complaint (Docket Document No. 45) at ¶ 78.

71)     At no time did the Firm communicate with or solicit Schmidt to sell her any
goods or services.

72)     Darlene Schmidt was not a client of the Firm, nor did she purchase any goods or
services from the Firm.  To the contrary, Ms. Schmidt was a defendant in a lawsuit the Firm was
prosecuting on behalf of its client, KeyBank.[17]

73)     By the terms of her agreement with KeyBank, Ms. Schmidt agreed to pay, among
other things, reasonable attorneys' fees incurred in connection with any foreclosure proceeding.
*See, e.g.,* Exhibit N, Schedule D at p. 4, ¶ 19 "In any lawsuit for foreclosure and sale, Lender will
have the right to collect all costs and disbursements and additional allowances allowed by law

---

[17]     In this context, the Firm provided copies of the Summons and Complaint to a process
service vendor to effect service of process.  The process service company personally served Ms.
Schmidt pursuant to N.Y. C.P.L.R. § 308(1), served three "John Doe" occupants via leave-and-
mail service pursuant to N.Y. C.P.L.R. § 308(2), mailed an additional Summons as is required by
N.Y. C.P.L.R. § 3215(g), and also mailed statutory notices via first class and certified mail,
return receipt requested, to the occupants as required by N.Y. R.P.A.P.L. § 1303(5).  The process
service company also effected the filing of the affidavits of service, copies of which are attached
as Exhibit "O."  On the completion of service, the process service company employed sent the
Firm an invoice for $520.00, a copy of which is attached as Exhibit "P."  After reading the
Proposed Amended Complaint I asked the process service vendor to provide a breakdown of
how he calculated the invoice for $520.00.  A copy of the breakdown of the charge for services
was provided and is annexed hereto as Exhibit "Q."

and will have the right to add all reasonable attorneys' fees to the amount Mortgagor owes Lender, which fees shall become part of the Sums Secured."

74)     Before the Firm could file a Request for Judicial Intervention (hereinafter RJI), the Firm had to follow the Administrative Order 548/10 of then-Chief Administrative Judge Ann T. Pfau, as amended in Administrative Order 431/11.  In sum and substance, the Administrative Order required certain certifications that a foreclosure attorney had to obtain from its client so it could file a certain form affirmation.  The RJI could not be filed under the Administrative Order without the certification.[18]

75)     The Firm received the certification from KeyBank on or about November 15, 2012, and sent the Affirmation required by the Administrative Order and the RJI for filing on December 6, 2012.  Copies of the aforementioned Affirmation and RJI are annexed hereto as Exhibit "R".

76)     Since the RJI requested a settlement conference pursuant to N.Y. C.P.L.R. § 3408, the State Court scheduled a Settlement Conference for January 11, 2013[19].

77)     On December 28, 2012, the Firm was advised by its client to put its file on hold as the client and Ms. Schmidt were directly working with each other on loss mitigation.

78)     Even though the Firm was asked by its client to put its file on hold, the Firm was required to prepare for and attend the settlement conference.  The Firm discovered that KeyBank was working directly with Ms. Schmidt and/or her attorney on a "re-age" plan[20]; and that

---

[18]     This process has since been replaced with a Certificate of Merit to be filed with the Complaint pursuant to N.Y. C.P.L.R. § 3012-b, which became effective on August 30, 2013.

[19]     Before the first settlement conference, which occurred on January 11, 2013, the Firm was paid $2,734.06 in attorneys' fees and costs by its client.

[20]     As Your Affiant understands the "re-age" plan, generally, the bank puts the foreclosure of the HELOC mortgage on hold for approximately 90 days to give a mortgagor an opportunity

Schmidt made the first of three payments of $427.89 to effectuate the re-age. The Firm was not involved with the bank-borrower negotiations which had begun prior to the first statutorily-mandated Court-supervised settlement conference.

79)    At the January 11, 2013, settlement conference, the Firm reported the foregoing information regarding the negotiations between its client and Schmidt to the Court. Attorney Amy Gathings of WNYLC, a co-worker of Attorney Williams, appeared for Ms. Schmidt and asked for a copy of the re-age paperwork, if any, and asked for the matter to be adjourned. The settlement conference was adjourned to March 4, 2013.

80)    KeyBank closed our file on February 19, 2013; upon information and belief, the re-age was completed. However, since the settlement conferences were ongoing, we were required to continue to prepare for and attend them.

81)    At the March 4, 2013, settlement conference, the Firm advised the Court that the re-age was completed and the account was considered current by KeyBank. Attorney Keisha Williams appeared and would not allow the settlement conference to be concluded or the action to be discontinued. She demanded production of the re-age paperwork and the conference was adjourned to April 8, 2013.

82)    On March 7, 2013, Attorney Williams called the Firm and spoke with one of the Firm's legal assistants (Paul Beverly). Attorney Williams was advised that KeyBank would send the re-age papers directly to her client and that the Firm did not have them. Attorney Williams stated she had a bank contact and hung up the phone.

---

to make three payments. If the payments are made timely, then certain amounts that the bank chooses to recover are rolled back into the principal balance of the line of credit and the account is considered current. Once the re-age is completed, the foreclosure is to be closed.

83)     On or about March 29, 2013, KeyBank authorized the firm to invoice the bank for $300.00 in attorneys' fees to prepare, obtain, file, scan, and preserve the necessary paperwork to discontinue the action.

84)     Prior to the April 8 conference, the Firm was unable to obtain the documents requested by Ms. Schmidt's attorneys. Attorney Williams appeared on behalf of Ms. Schmidt and stated that she had contacted KeyBank directly[21] and received the figures she was seeking from them. Attorney Williams then stated she wanted to discuss fees and disbursements. The settlement conference was once again adjourned to May 13, 2013.

85)     On or about April 17, 2013, the Firm sent Attorney Williams a consent form to discontinue the foreclosure action for her signature and return.

86)     Attorney Williams called the Firm and spoke with Legal Assistant Bryan Jones, confirming that she received the consent form and stating that she wanted a breakdown of attorneys' fees for which the bank was seeking reimbursement. She indicated she would provide us with a written request. A copy of that request is annexed hereto as Exhibit "S."

87)     To be able to comply with the request, the Firm needed additional information from its client.

88)     During the May 13, 2013, settlement conference, Attorney Williams appeared on behalf of Ms. Schmidt. Ms. Williams stated that she had again communicated directly with a representative of KeyBank[22], who, she alleged, instructed her that any breakdown of fees and

---

[21]     Your Affiant's file is bereft any indication that the firm gave Attorney Williams permission to contact its client directly on this matter. Despite apparently not having the consent of the attorneys representing a party to an action, Attorney Williams contacted KeyBank, a represented party, directly. See 22 N.Y.C.R.R. § 1200.0, Rule 4.2.

[22]     Again, Your Affiant sees no note or writing in the Firm's file that indicates that Ms. Williams was given permission to communicate directly with the client being represented by the Firm.

costs that the firm charged KeyBank must come from the Firm.  The matter was adjourned to May 31, 2013.

89)     The May 31 conference was adjourned to July 15, 2013.  The Firm did not know what KeyBank charged to Ms. Schmidt's account and, accordingly, could not provide a breakdown.  It was not until on or about June 12, 2013, that the Firm received a breakdown from KeyBank of $9,664.53 that appeared to have been included in the re-age.  *See* Amended Complaint Exhibit H.[23]

90)     It should be noted that the Firm did not prepare or transmit the documents or information in Exhibits "G" and "H" of the Amended Complaint.  The Firm had no control or supervision of the creation of those documents, which, upon information and belief, were created by KeyBank.

91)     At the July 15, 2013, conference, Attorney Williams requested written confirmation of the breakdown of the "Outstanding Legal Fees and Costs."  In response to Attorney Williams's request, the Firm obtained the information from its client and responded directly to Attorney Williams with the August 9, 2013 letter attached to the Amended Complaint as Exhibit "I".

92)     The Firm obtained additional information from its client leading the Firm to believe that the "Outstanding Legal Fees and Costs" of $9,664.53 as listed in proposed Amended Complaint Exhibit G (which was prepared and sent by Keybank), should have been $3,443.56.  It appeared that amount included a $34.00 Broker's Price Opinion, and a re-conveyance fee of

---

[23]     These figures included items that are clearly not attributable to the Firm.  For example, a BPO is a Broker's Price Opinion, or a valuation that a bank's vendor gives after visiting the premises and looking at comparable properties with recent sales.  The Firm does not perform these services for any of its clients.  Also, the "Re-age deferment" is clearly not an attorneys' fee or cost.  At most, the "Attorney Fees and Costs" appear to be the only item listed on Amended Complaint Exhibit "H" that could be attributable to the Firm.

$50.50 in the "Outstanding Legal Fees and Costs," even though those services were not performed by the Firm, not billed to KeyBank by the Firm, and are not fees or costs accrued by the Firm.

93)  At the request of Attorney Williams at the July 15, 2013 conference, the Firm provided her with the breakdown and calculation of the $3,443.56 that KeyBank listed as "Outstanding Legal Fees and Costs." *See* Amended Complaint, Exhibit "I".

94)  Another copy of the consent to discontinue the action was mailed to Attorney Williams on August 6, 2013.

95)  After review of the breakdown of the "Outstanding Legal Fees and Costs" and at an August 9, 2013 conference in the presence of the Court via Confidential Law Clerk Jennifer Runfola, Attorney Williams confirmed that she was satisfied with the breakdown provided, but that she alleged that KeyBank's billing statement was not correct. The conference was continued to September 20, 2013, to give KeyBank an opportunity to correct its billing statement. The Firm has no control over KeyBank's billing statements.

96)  The form for Attorney Williams to consent to discontinue the action was re-sent to Attorney Williams on August 20, and September 5, 2013.

97)  On September 10, 2013, Attorney Williams called the Firm and advised that she refused to consent to discontinue the action unless and until the Firm's client reduced the amount of attorneys' fees to be paid as part of the re-age.

98)  At the September 20, 2013, conference, Attorney Williams reported that KeyBank did not correct Schmidt's statement; that no such change occurred on Schmidt's September statement; that she again had contacted[24] KeyBank directly to ask why; and suggested that

---

[24]  Again, without the permission of the Attorneys representing KeyBank on the matter.

KeyBank told her that nobody from the Firm told them to change the statement. Attorney Williams was reminded at the conference that she should not be contacting KeyBank directly since they were represented by counsel. The conference was adjourned to November 15, 2013.

99)    On September 26, and October 15, 2013, legal assistants Bryan Jones and Jessica Ellis called and left one message on each day for Attorney Williams to follow up on the consent to discontinue the action and left a voicemail. The form for Attorney Williams' consent to discontinue the action was re-sent to her on October 24 and November 9, 2013. Attorney Williams did return the phone call and left a voicemail message.

100)   Instead of consenting to discontinue the action, Attorney Williams, on behalf of Ms. Schmidt, filed a motion to bar KeyBank from recovering more than $150.00 in attorneys' fees and costs and to award Schmidt's Attorneys' fees and costs. A copy of Schmidt's motion, with NPPI redacted[25], is annexed hereto as Exhibit "T".

101)   On November 22, 2013, the Firm sent Attorney Williams an e-mail (Amended Complaint Exhibit K) that explained certain items that the Firm charged to KeyBank were of the type that KeyBank routinely does not seek reimbursement for from their mortgage customers. For reasons unknown to the firm, KeyBank apparently included certain items it usually considers to be "non-recoverable."[26]

---

[25]    Schmidt's Counsel filed the motion with exhibits that contained private and sensitive information like Schmidt's KeyBank account number for her home equity line of credit throughout several exhibits and her phone number provided to Attorney Williams in an e-mail that would otherwise appear to be an attorney-client privileged communication. It should be noted that Attorney Williams had her client's e-mail address redacted in Exhibit "N" of the motion before filing the motion, even though she left the loan number and personal phone number of her client in the exhibits. Your Affiant has redacted the account numbers and phone number from the exhibits of the motion so as not to exacerbate the risk of identity theft and damage to which Attorney Williams exposed her client.

[26]    Many of the Firm's clients make or have made business decisions to refrain from charging their customers certain fees and/or disbursements. For example, the Firm may earn a fee for filing certain information with the Department of Financial Services (DFS) pursuant to

102)   Schmidt's motion was originally returnable on December 6, 2013.   However, there was a return date before the Court with Confidential Law Clerk Dan Furlong, presiding, on December 20, 2013.   Attorney Williams stated that $2,000.00 in fees and costs were more equitable than the $3,359.06[27] in fees and disbursements charged to KeyBank and previously itemized by the Firm in August 2013.   The motion was ultimately adjourned to February 28, 2014, to allow the parties an opportunity to resolve the remaining issues.

103)   The staff within the Firm who work on discontinuances sent the form for Attorney Williams to consent to discontinue the action on December 2 and 17, 2013, January 6, 21, and February 10, 2014.

104)   On February 14, 2014, Firm Attorney Vikram S. Vilkhu had a telephonic conference with Attorney Williams to discuss the matter.   A corrected January 2014 monthly billing statement and the previous breakdown of the Firm's fees and costs charged to KeyBank were discussed.   Attorney Williams agreed with our position and stated she would withdraw her motion once she discussed same with her client.

105)   On February 27, 2014, Attorney Williams advised the Court in an e-mail, that "Mr. Vilkhu and I were able to resolve the outstanding issues"[28] and that she executed and

---

N.Y. R.P.A.P.L. § 1306 and DFS regulations that require filings within a short period of time after a 90-day notice is mailed, after a Complaint is filed, and after a Judgment of Foreclosure and Sale is entered.   While the Firm's clients will pay the Firm for filings with the DFS, which is necessary to maintain compliance with statute and regulation, some clients make a business decision to forego billing those amounts back to the borrower.

[27]   It should be noted, here, that by the end of the matter, the Firm was paid a total of $4,654.86 by KeyBank, which is significantly more (almost 40% more) then the $3,359.06 that KeyBank appeared to recover through the re-age plan.

[28]   Frankly, and with all due respect to Plaintiffs' Counsel, Your Affiant is at a complete loss on how Attorney Williams was able to "resolve the outstanding issues" in February 2014 only to turn around in July 2016 to amend the Complaint against the firm to add Ms. Schmidt to assert a State law claim against the firm on the issue of what KeyBank may have charged back to her client in the re-age agreement.

returned the consent to discontinue the action.  A copy of Attorney Williams's e-mail is annexed hereto as Exhibit "U."

106)   The discontinuance of the foreclosure action was filed on or about March 20, 2014, after the Firm received Attorney Williams's consent to discontinue the action.  A copy of the filed discontinuance is annexed hereto as Exhibit "V."  The Firm was paid the full amount of its fees by its client, regardless of what KeyBank actually recovered from Schmidt.

WHEREFORE, your deponent respectfully prays for an order granting Defendant's motion for summary judgment, dismissing the Complaint with prejudice, and grants any further relief that the court may deem just and proper.

By: _____
David. P. Case, Esq.

Sworn to before me this
28th_day of July, 2017.

_____
Notary Public

ERIKA ANNE MUSSO
Notary Public, State of New York
Qualified in Monroe County
No. 01MU6289358
Commission Expires September 23, 20 17

13699337.2